I think we just have one case on the docket this morning. Could we call it, please? 14-1477, People's Service, Carlisle, Oglesby. Would counsel presenting argument today please approach, introduce yourselves for the record, and spell your last name? Cynthia Giacchetti, C-Y-N-T-H-I-A, Giacchetti, G-I-A-C-C-H-E-T-T-I, representing Defendant of Health. Good morning. Assistant State Attorney Samantha Lemke, last name is spelled L-E-M-K-E, on behalf of the people of the state of Illinois. Good morning, Ms. Lemke. Good morning. Well, we typically allocate about 15 minutes per side. I think it's fair to say that we may go beyond that today, so we will be lenient with that. Having said that, Ms. Giacchetti, would you like to reserve some time? I would like to reserve five minutes if possible. Okay, we can sure do that. Very well. Ms. Giacchetti, when you're ready, we are. May it please the Court, good morning. Defendant Appellant Carla Oglesby was convicted of four counts, two counts of theft, one count of money laundering, and a fourth count of unlawful stringing of bids. She received sentences of 78 months, 60 months, and 36 months as to each of those. I would like to focus today on the insufficiency of the evidence as to these various charges. Primarily, I'd like to focus on the insufficiency of the evidence as to the intent required for the theft convictions. The theft convictions then underlie the money laundering. And I think for purposes of argument that that is the most important issue to focus on. I acknowledge the standard of review in this Court. I understand that. But the State still needs to present sufficient evidence as to every element of the charges. And it's our position they did not. In particular, as to the element which is underlying both theft charges, that the defendant intended to permanently deprive the victim of the use and benefit of the property. The case relates to 15 contracts that were issued between the county and certain vendors. That's the money at issue. And so it is our position that the intent that had to be required was that Zogles v. New, at the time the contracts were entered into, that the vendors would not perform the work. We've cited some contract cases, Reich and Rolston, in which it's clear that if something happens in the middle of a contract and the services are not provided, that may be a civil matter, but it's not a criminal. There's something, though, rather peculiarly unusual about the fact that the checks were being issued almost, well, in almost every case before any work was done. And there was testimony in the record that really this kind of course of conduct had never, ever been done before. And really in the normal business world, you would never, ever be paid for something you haven't done. And certainly that was characterized as unusual. I think in order to make an inference from that, that it was intended that the work not be done, we'd have to look at it in context. Number one, everyone is it a reasonable inference, though, that if nobody, if people generally don't get paid until they do work, that you might infer there's something maybe perhaps improper about giving checks out for $2,500, just under $25,000, though, for work you haven't even begun. I certainly think improper is a possible inference, but not to prove that the work was not going to be done. And I think the context of this is number one. Okay. This is kind of a circumstantial case, would you say? Okay. Yes, exactly. That's just one of the inferences. But what about the fact that some of these companies, well, one wasn't even in existence when the letter went out. Several were created within days, and actually many of them just stopped functioning. So is that another inference of some kind of impropriety? We'll call it that. There was no evidence in the record that the defendant knew that. The defendant was the partner in several of the companies, wasn't she? Two of the companies, but those are not the companies of which there was evidence of relating to corporations. Those two were valid companies. They were valid companies that she had formed and that she signed off on the justification letters for, correct? They were companies that had been in business well before she did this job that she had financial connection to, yes, and that was revealed when she was hired. Well, it was more than a financial connection. She was a partner in those. I believe in at least one of them, that's true. CGC, she was a partner and signed off on her county. That's correct. But again, you don't think that was strange at all? I think that's a conflict of interest. I think that's a conflict of interest, and she was charged with official misconduct, but she was acquitted of official misconduct. Which really doesn't mean much, though. The bench trial, the judge shows what counts to select in terms of how he felt. He should enter his findings guilty. But, you know, when you talk about knowledge, and that's what you're trying to emphasize, that she had no knowledge. Again, knowledge like intent is something that most often is never directly proved. It's taken or it's based upon inferences that are made from other facts that are presented, isn't it? I mean, knowledge is generally not something that we prove directly or that is proved directly. Well, sometimes it can be. It can be. But in the vast majority of cases, it isn't. In this case, the vendors dealt with Eugene Mullins. They did not deal with Carla Oglesby. He negotiated the contracts. He put together all the paperwork, including Annette Goldsmith. His assistant wrote all the justification letters for this. He monitored the work. He directed the work. He determined what the work was. You said he initiated all the... Yes, all of the contracts. But the letters. The letters, yes. Annette Goldsmith was his assistant. She testified that she wrote every one of the justification letters. Okay, let me ask you this. Those letters, each and every one of them were signed, or maybe I'm wrong about the number, but didn't Carla Oglesby affix her signature to every single letter? Not to every single letter, but some of them. I believe... Eight? Possibly, yes. So in her position, are you suggesting that it can't be inferred that, like any other person, she would consider and look at and investigate what she was doing before she put her name on each one of those letters?  Mr. Ramos and Mr. Gibbons also signed letters. They were heads of departments, and they testified that they relied on Mr. Mullins to write and handle them. Sure, but I'm not asking you about what someone said, that they relied on someone else. The question is, could the court infer that when someone puts their name on a letter and that letter says certain things about this company and why it was the only company that could do the job, that that person didn't take any time, didn't consider what they were doing when they put their name on it, to request that that contract be given? I actually do not think that's necessarily an inference because of the structure of the government here in which somebody below this person has the responsibility for writing that. But in the age of transparency, don't we expect that? That when you put your name on a letter, that you have some semblance of knowledge of what you're doing? And, I mean, isn't that just kind of basic? That may be a better approach and a better standard, but I don't believe it is the way the evidence indicates that this signing of the letters worked. The court has to accept the testimony of these individuals saying, well, this is how we did it, we just, somebody else did it. Somebody else did it, I just put my name on it. Is that something the court has to accept? Or does the court get to pick out little tiny pieces of the whole pie and decide which ones they believe and which ones they don't believe? Well, obviously a court has the discretion to make credibility determinations and to evaluate the evidence. But if you, first of all, if you say that these are the state witnesses, that you don't believe any of the state witnesses, what you end up with is not the evidence of the opposite. You end up with a whole and no evidence. But that's not really the principle I'm actually referencing. There's multiple cases that say that the fact finder can select parts of the testimony that it believes and it can reject parts of the testimony that it doesn't believe. It's done routinely and very commonly. So that's what I'm talking about. That the prior fact is the one that saw the witnesses, that heard the witnesses. And the prior fact can always parse out the unbelievable to the believable. And the court can infer, based on multiple things that it's heard, whether there's knowledge, intent, and the like. And what the judge said, though, was not that she did not intend that there would be work done, but that this was not a good use of government money. But there was evidence in the record that there was virtually no work done by these contractors, right? Whatever he may have said in open court, there was evidence to support that finding, wasn't there? I think if you take out Patrick Blanchard's testimony. Well, let's just focus on, to begin with, the two companies that she had an interest in. Right. At what? The trial court found, with regard to those two contracts, that no work was done, right? There was some testimony from somebody at CGC, but he didn't accept that testimony. He didn't find it credible, right? That's my understanding, yes. Okay, so as to those, when we talk about whether the defendant intended that work would be done, those were her companies. So how could we conclude from that that there's no evidence that she intended that the work that was to be performed would be performed, that she was expecting it to be performed? They were her companies. There was evidence that she, there were her companies from a financial view. There was no evidence that she was involved in monitoring the work done by those companies, by any of these companies. That was being done by Mullins. Ms. GK, if I could pull you on that. Monitoring the work done by her own company? I'm sorry. Go ahead. She wasn't, maybe not as a county official, but those were her companies. I understand that, Judge, but there was no evidence that she was monitoring what was being done under those contracts. There wasn't. There was evidence that she had financial, that there was financial, it went into accounts that she held, but that she was on a day-to-day monitoring what that was being done. I do not believe there was any testimony. She was a signer, wasn't she? That's correct. Someone that held all the purse strings on her two companies. She always remained the one that would sign off on money for her own companies. That, it is accurate that she had financial control, but not. With regard to these other vendors, these other contracts, didn't the evidence show that there was either no work done whatsoever on the contracts, or at best, a token pretense of performing a little bit of work? Isn't that what the trial court found? She did, and each one of them testified that they intended to, or it stipulated they intended to perform, and again, there was absolutely no evidence that she knew what was being done. They testified or stipulated to meeting with Mullins in terms of what work was being done. Can I pull you off of that for one second? If we find that there was sufficient evidence for theft, and the trial court did not err in finding her guilty of theft, does the money laundering count? Does your argument regarding money laundering fail? Well, the first argument does, but not the second, and that was that it was charged, the charge was that the money laundering was transactions were performed by the defendant were actually transactions that were performed by Ramson Isaac. It's our position that because he testified, he testified he'd never met her, she had nothing to do with those transactions, although if theft is found, then the proceeds are from the theft, but she did not perform the monetary transactions. Is that because in the indictment it says, including placing funds in? Yes. But what does that mean, including? Doesn't that mean that the transactions included this, but it's not all of the transactions because they refer to cash payments, wire transfers, withdrawals, checks, and then they say including, meaning some of those included the transfers to the attorney at home. I understand that. That's why we cited the Fields case. It is under Fields at pretrial dismissal, so that's under a different standard. You only raise it in post-trial, correct? Yes, that's correct. But in Fields it didn't have $100,000 of money from the county, did it? Isn't this what they did here? They actually said that the laundering involves the $100,000 that was stolen. We'll use the word stolen, but theft. The theft of the $100,000 was the money. So there was an allegation that the money that was being laundered was the $100,000. In Fields there was no allegation of what the money was for the funds that were being laundered. Yes, but the gist of money laundering is the financial transaction itself. Right. And the only financial transaction that was identified. In a worst-case scenario, if Ms. Oglesby specifically was planning to have all these contracts sole-sourced out for the specific purpose of taking that money, it had to be placed somewhere. And placing it in corporations that came out of nowhere in a day or that folded after doing nothing or one that was created after the fact, isn't that initiating the laundering? Because the actual derived stolen property before the fact has to go somewhere. And it went to these phonied up, and we're using this in the worst-case scenario, trumped-up corporations. That's how the money was laundered. Again, the record is that Ramson Isaac, these transactions were done by Ramson Isaac. He had absolutely no connection to her. The ones in his, those that went into his account. But before they got to that account, there was a disguising of them into these other corporations. In the worst-case scenario. I don't know that that's the way the checks did go. It was my understanding that the checks he put in were the checks that came out of the county. I want to make sure I understand your money laundering argument. Is it that the financial transactions were not sufficiently detailed in the indictment? Is that part of it? Yes, that is part of it. So how is that argument not weighed? That was never brought up. If you have a deficiency in the indictment, isn't it weighed unless you bring it up before you go to trial on it? You go to trial on that issue, you're kind of conceding it, aren't you? It's my understanding that what they understood is that the transaction that was being charged was the one that was detailed. So not any other transaction. So now if we have to analyze it as a post-trial, you do preserve the issue post-trial. So if we analyze it on the merit, there's only two things that we've got to look at, right? Whether he was unable to prepare a defense, she was unable to prepare a defense. Do you agree with me on that one? Yes. And do you think there's sufficient facts in the indictment that she could prepare a defense? To that, no, because I think what was understood on that was that it was focusing on the Ramson-Isaac transactions. And wasn't that what they did focus on? That's what they did. Okay, so she did prepare a defense based on that. For that. For that. And then the other thing they have to show is that conviction would preclude future prosecution. It's specifically delineated enough to know exactly she's not going to get tried again for something because the indictment was too vague, right? Yes. Okay. But that would only be for the Ramson-Isaac transactions. Okay. So for the Ramson-Isaac transactions, how is it not sufficient? Because she knew it was about those transactions, right? Yes. And she prepared a defense and went to trial on that, right? Yes. But what the State is arguing now is not that it is that the Ramson-Isaac. As I understand it, our position is that there's no showing that she was involved in those particular transactions. So as I understand your position, it's twofold. With regard to the Ramson-Isaac, you're conceding that that was sufficiently pled in the indictment. You're saying there wasn't evidence of your client's involvement in those transactions. That's correct. With regard to anything other than the IALTA transactions, the Ramson-Isaac, that's where you come in and say you didn't allege that in the indictment. Do I have that right? That's correct. Okay. What about the $1,500 transfer from I'm not sure which one of the came out of the attorney's account, went into the beat? Beat bankers. Beat bankers. And then that went to her company, CET. What about that $1,500 transfer? Again, all that is in the record is somebody handing that check to Ms. Anna Wischke and her saying, I don't know what this is for. It was accepted by Oglesby because this is her company and she was the one in charge of the firm. It was put into the account, but she did not say what it was for. Would you agree that there was sufficient evidence that that money had been laundered by Ramson-Isaac to get to CGC, whether your client had anything to do with it or not? Isn't that part of the money? There was about $100,000 that Ramson-Isaac took. He did a bunch of financial transactions and he testified to them, right? He moved money around to different parts of Terrell Harris's companies, one of which was beat bankers, right? And the beat bankers, lo and behold, gives $5,000 to your client's company. That is part of the laundered money route getting to CGC, isn't it? In other words, that $5,000 was laundered money. Whether she knew about it, we can have a different discussion, but would you admit that much? If it was money from – if there's a finding of theft, then that transaction would be among the Ramson-Isaac transactions, yes. If the theft counts stand, you agree that the $5,000 deposit was laundered? Again, I don't agree that Ms. Foglesby knew that or was involved in that transaction, so I don't think she could be convicted of that charge. All right. Well, if she – is there sufficient evidence that she knew it was laundered money? No, no. So – Is that a requirement? It's required that she be involved in the transactions. I mean, the crime is participating in the monetary transaction. What, is receiving a kickback that was ultimately laundered to get to you, participating in the transaction? I don't believe that that is sufficient for money laundering. Well, what it focuses on – money laundering is something that you are involved in and that you do to disguise it. Well, let me ask you – And I suppose somebody else could do it if you were associated and knew about it, but the fact that somebody else does it is not – Can you assure her that she knew about it, or is that not – I don't think there's the slightest bit of evidence to that. He didn't know who she was. The state's brief suggests what I suggested, and that is this. They argue – I want your – I want your response to this. They argue that the basis of the money laundering was defendants' theft of over $100,000 of county money using illegitimate vendor contracts. They say her conduct was – they say her conduct was initiating, participating, but that the laundering started at the top. It wasn't later just moving money. It started at the very top. It was initiated because there was $100,000 worth of money that she knew she was going to take, and she had to launder it by placing it into all these illegitimate vendor contracts, the companies that were set up for taking of this derived unlawful money. For example, the woman who was a caterer who was suddenly a corporation to do PR work. That's their position, that this started at the top. It wasn't a bunch of money being funneled later. It started at the very beginning. The plan from the beginning was to acquire all this money, and then it had to go somewhere. It had to be placed somewhere, and therefore it was laundered through the phony companies. That's their position. Now, how do you respond to that argument? Well, Judge, I did not understand. I thought they were focusing on the checks that went into CGC. That's really how I understand their argument about why this is money laundering. I would say that you've got to get the theft first, and then you have the proceeds, and then the proceeds have to be transferred something. The theft itself can't be the money laundering. You have to have the proceeds first. Well, their argument is that there was this plan to steal a bunch of money in a period of time, and that the theft of that $100,000 had to be put somewhere. It had to be placed somewhere so that it wouldn't look like a theft. And that's why these companies that were virtually created out of cloth within days accepted the money. And from that, they say the court could infer that she initiated, she participated, she conducted because she was one of the originators, if you will. I don't think the theft can be the same thing as the money laundering. I think the money laundering goes after the next step. Sure, but that's their argument. The theft of all this money, the $100,000, that was the original plan, but the plan was how do we make this look like it's not a theft? So we create companies that are created in a day or so and then accept the money. And the vendors never did the work. So there's all these inferences about how this money was being laundered because none of the work was done. The people that were in the corporations had no experience in PR. One was a caterer. And then there's these letters saying all these people are really qualified and they should be the only ones doing this. This is the sole source and she's the one that put her name on all the letters. So, I mean, it's kind of a big thing. But that's their argument in the brief is that the laundering started at the very beginning with the theft of the money, that the money that was stolen had to be laundered somewhere. So it was laundered through vendors that were basically illegitimate. I understand that. I would say you have to have the theft and then you have to have the monetary transaction. And it's the monetary transaction that's the money laundered. It wasn't laundered through the lawyer's account that she didn't really have any knowledge of. There's no evidence that she even knew this. He testified. Right. Well, is it a reasonable inference that she was expecting a kickback? No, Judge, there was no evidence of her being expecting a kickback. Well, as I understand, Judge Lynn viewed things. Four contracts went to Terrell Harris and at the back end, she got some money from one of Terrell Harris's companies. And he viewed that, I believe, as theft. He took that as, maybe not theft, but as a kickback, that she was getting some money in exchange for doing that. So even if she may not have directed the attorney, Ramson Isaac, in exactly how to move what money to what account, wasn't she expecting to get some money concealed as a legitimate business transaction on the back end? Is it a reasonable inference for the court to have thought that? I did not believe the judge went as far as saying that that was a kickback. And perhaps I missed that, but I didn't believe he did. No, I don't think he said those words either. I think you're right about that. But we're looking at the sufficiency of the record. Right, right. I do not think there's – they did not call one person who could support that, and I don't think that it can be supported. Yes, there was a prior business relationship between some of Mr. Harris's businesses and these, and all Ms. Anna Wischke could say is, I don't – I'm not familiar with this account. That's all she was able to say. She did not – wasn't able to. Didn't the company just send them $5,000? They didn't know why? No, I think what she said is he had a prior business they had done for him, but she didn't know what – she didn't know if it went to any of that business or not. That's, I think, the fair inference from what she said. She just didn't know. Okay. Okay. Ms. JK, can we address the – before we exhaust you too much, could we address the bid stringing? Yes. The last count is a relatively unusual statute and could not find one case on it. So, but the – Did you look out of Illinois? I did not. I didn't. But our position is basically that as we understand the charge, that this was the idea that the $200,000 contracts were put – made as to under $25,000. Right. The evidence, number one, was nobody testified as to who decided to do that. In fact, the only place it could have been decided was, again, Mr. Mullins. He set up these contracts. But didn't she go, as soon as she came in, within days of getting her position with the county, didn't she talk to – and I can't remember – Abassi? Abassi. Abassi about how do I go about getting around the county board because they don't like Strozier? How do I go about doing that? There was that conversation. And didn't she immediately then start those proceedings so she could get several bids under the $25,000 mark? Again, she did not make that decision. That decision – what happened is, as I believe it's – Williams testified that originally they were sent to $100,000. And she never testified that in that form that competitive bidding would be required. In all those letters, weren't they all about sole sourcing? You know, the contracts. Yes. Many of the justification letters were based on sole sourcing. Right. And was her signature on a number of those? It was. What would be the point of the sole sourcing? I'm not talking about any criminal motive or anything else. What does sole sourcing do in terms of practical realities? Well, one of the things that was testified – that's true. But then the no bidding comes from the sole sourcing. It doesn't come from the stringing. Right. So what you have to have is – It doesn't come from the stringing. In other words, the two $100,000s were sole sourced. They didn't require competitive bidding. The statute requires that you string the bid – in other words, make it all the $25,000 – for the purpose of avoiding the bidding. No, bid stringing is when you structure a contract, whatever that means, in a way to avoid competitive bidding. But you're saying that if the allegations were true, it wasn't to avoid the competitive bidding. It was to avoid the county board approval. That's correct. And that's what the indictment charges. Right. And that's what the indictment charges. And that's what the conversation was. There was no conversation about avoiding bidding. He did testify that sole source avoided bidding. He did not testify that that was his conversation. It was just an extra bonus, not the original. That was not the conversation. Wasn't there any evidence in the record, though? Actually, wasn't there all sorts of evidence in the record, that if a contract is sole sourced, it doesn't matter what the amount is, but if it's sole sourced, there will not be competitive bidding? I believe there was testimony to that, yes. And every one of those letters was about sole sourcing a contract, correct? I believe the majority of them were. Did the lawyer have to justify a sole source? Yes. All right. And she signed numerous letters in which she said that this company is particularly perfect for this particular job, that's why we should sole source it. Or it's to that effect. Again, yes. Yes. She did sign them. All right. And the $25,000 was another – that has nothing to do with the stringing, but it does have to do with they wouldn't be scrutinized in any way, shape, or form by the board because they were under $25,000. Under $25,000 did not go to the board. That's correct. It has nothing to do with stringing. You tell us what you think the stringing means in terms of what you have to do to string a bid. My understanding for string is you have to structure it, is the definition. Okay. And – If you structure something by putting into a letter that you wanted it to be sole sourced for the specific purpose of avoiding the bidding, do you have to do that more than once? Is that what you're saying when you have to string, or is it just one single contract could be strong if the purpose was to make sure that there was no competitive bidding? The way it was charged was that the contracts were broken up into $25,000 for the purpose of – and that's how the stringing was defined in the indictment. Yes. Yes. So there really – it wasn't for the purpose – the indictment doesn't say anything about the bidding. Right. It just says it was – it says it was for the purpose of evading the bidding. Right, in the first line. But the way it was done was to split them up into the eight, from the two that – from the one that was $200,000 down to the two that were $100,000 down to the eight that became $25,000. Right? Yes. But there's nothing in there about the – that they were strung for the purpose of preventing the bidding. That's correct, and there was no evidence of that. And that's how you tried the case. That's how you defended it. That's how the counsel defended it. I was not the trial counsel. Well, it was defended – That's correct. All right, Ms. Cicchetti, thank you very much. We'll reserve some time for you. Ms. Lemke. Good morning, Your Honors. Again, my name is Samantha Lemke, and I represent the people of the State of Illinois. May it please the Court, in a matter of mere weeks from the date the defendant was hired, she used her position as the Deputy Chief of Staff to the then Cook County President to steal over $325,000 of county funds. She collaborated with other individuals to obtain an unheard-of scope and level of authority, and she then used that authority to facilitate contracts to shale companies that she used as fronts for her theft. That authority was granted to her and to her alone, and every step of the way she funneled these county funds to accounts controlled by herself as well as her accomplices, always insuring and attempting to shield her criminal activities from county authorities. Is the offense of money laundering supposed to be supplanting theft, or is it a separate charge that requires that the money be disguised, funneled, transferred to different accounts? They're tied together factually, but it is a separate charge. We have charges of theft, two of them, theft by deception and just theft, but the money laundering was separately charged because of the way the money was handled once it was stolen as well. But under the money laundering count, I'm sorry, Judge, am I right? Under the money laundering count, do you just say financial transactions? Doesn't the defense have a right to know exactly what they're defending against? Financial transactions is pretty broad and pretty vague, isn't it? That's correct. The financial transactions that were charged in the indictment, and I will also note that the defendant in the very early pages of her brief stated she was not challenging the sufficiency of the indictment. So these issues were not even raised even on appeal because the indictment wasn't challenged. However, in this money laundering count, she does specifically challenge how it's worded, and as to the wording of it, the financial transactions discuss several transactions of the money and how it's handled, where it's moved to. It specifically states that the money was placed in different accounts to disguise it, including the accounts of individual N. That would be Mr. Rams and Isaac. Well, what was the account then where it was laundered as far as she's concerned? As far as there's testimony, clearly, that she didn't know this attorney and was not aware at all about the money that was funneled through his attorney account, correct? I would say there's testimony that she didn't know the attorney. I don't think there's testimony she didn't know what was happening. I think the circumstantial evidence definitely indicates that she was aware of what was happening because the person who was instructing Mr. Isaac on these transactions, the person who was telling him what to do with every single check, according to Mr. Isaac's own testimony, was Shorty Capone. Yes, but there's no testimony really that she was present for any of this, was there? That's correct. And Shorty Capone was present. He didn't testify. The lawyer testified about what this other person said. That's correct. But Shorty Capone, in the record, it's quite a large record. His only connection to anyone in the county is Carla Oglesby. She's the only person he's worked with in the past. Counsel herself in an argument just now stated they have a prior relationship. The record indicates that Mr. Capone and the defendant have a prior relationship through the company CGC. Go ahead. But does that mean that she knows what he's going to do with the money after she gets the money to his companies? I would say the totality of the circumstances did show that she knew what was going to happen with the money because the money came back to her, which is a key factor. The fact that she was the only one. Did she only fund $5,000 deposits into her other company? That's the one that we know came because it was a check, but there were also cash deposits. Cash deposits made into her company? Correct, the CGC's company. Right around the time. As to the exact number, I don't have the exact number, but there were several cash deposits in the amount of thousands of dollars that were made days after these checks were distributed to the IOLTA account and then also days after they were distributed to the companies, or to the, I shouldn't say companies because they didn't go to the company accounts. Who made the deposits into her company? The deposits to her company, their cash deposits, Carla Oglesby had sole signatory authority on those accounts. She was the only person. Correct, and in fact, Tessana Whiskey, who testified to running CGC at that time, testified she did not receive any money. But is there any evidence that any of that money came from Shorty Capone? There's no direct evidence it came from Shorty Capone. How are we supposed to attribute that to those particular transactions? I would argue it's circumstantial evidence in addition to everything else we have surrounding these contracts. You have a company that's basically under, well, not really functioning because she's working for the county, and so at the time the company isn't really doing anything, and that's what her, what's her last name? Anna Whiskey. Anna Whiskey. She said, well, really we weren't doing anything. So you have all sorts of cash deposits coming in around the same time that all this money that's being siphoned through the attorney account suddenly is appearing via cash payments into her own company. It's really not functioning right now. Well, it goes from, so starting with the IOLTA money, it goes into the IOLTA account. Those checks then get distributed almost entirely. I mean, there's about $150,000. They all go out. They go almost entirely, though, to BeatBangers, which is a company that doesn't receive any accounting contract. That is controlled by Shorty Capone and a company that's actually dissolved. It's been dissolved for over a year by the time it gets all this money. They receive almost $70,000. Mr. Capone himself receives $7,000 in his own personal account. Then there's a check from BeatBangers to CGC, the defiance company. You also said in addition to that $1,000, $5,000 check from BeatBangers, there are multiple cash deposits into her company right around the time that all this money has been funneled through some other company. Yes, by the time it goes out of the IOLTA to the other accounts, whether they be individual accounts or dissolved company accounts. There's also, though, I would note that there's money laundering between CGC accounts and array accounts. Those are the ones controlled by Griffin herself. Well, let me ask you about that. She never – it wasn't questioned that she was the owner of this company. No, not at all. So how is she disguising anything? Well, money is going into her company. There's no question that she didn't – she put it on her disclosure, didn't she, when she started working for the county? One of them. CGC. CGC she listed as a dual employer. Sure. So how can you say she was disguising anything? Well, she listed Array as a prior employer, not as a current company, and yet she still controlled Array's financial accounts entirely from before the date they received the check to well after the account was emptied. So the Array account that she controlled received $25,000 of county funds, was completely depleted, and only in June, two months after the investigation had began, only then did she sign over authority on the financial accounts to another individual. Either that was Mark Carter. Can we be very specific about the financial transactions we're talking about? So we've got the IALTA stuff, the Terrell, Harris, and Rams, and Isaac. Now we're talking about something different, right? Correct. We're talking about something going on with CGC and Array. Are you contending that when Cook County wrote out a check for $24,995 and gave it to CGC, and CGC took it and deposited it, was that money laundering? Well, actually, they didn't give it to CGC. The defendant requested that the money of the check be delivered directly to her office. So CGC's check went to her. But the money is made out to CGC. Correct. CGC deposits it. Is that money laundering? I would say initially that's theft. So you've got the theft. That's not the transaction you're talking about. As to the money going into CGC's account? Right. Correct. I'm just trying to lock down exactly what the financial transaction is. It's kind of important to know the financial transaction. Wouldn't you agree? Okay. So then another one is Cook County to Array. Correct. Okay. However that takes place, whoever delivers it to whomever, ultimately a check made out to Array goes into Array's checking account, right? It does. Okay. Is that money laundering? I would say that's still theft. Okay. Not money laundering. Okay. So then what is it with CGC and Array that you're calling money laundering? When one transferred to the other? Correct. There's actually two CGC accounts and one Array account that we have evidence of in the record. Okay. Once the county checks are deposited into those accounts, Array's account is empty before that money goes in. I think it has a balance of about $6, and it hadn't had any transactions in the prior two to three months. Sure. Once the check is deposited, money from that account is then transferred in chunks to CGC. Once the check is deposited into CGC's, one of their accounts, money from that account is then transferred also in chunks to CGC's second account. So there is money being transferred between accounts disguised as legitimate transactions when actually what it's doing is it's hiding the proceeds of this theft, a theft that's been created by the defendant's activities in conjunction with several other people that she worked with. But the theft occurred because the company that received the check couldn't, Array specifically, couldn't do the work, did not intend to do the work. It was never an intent for them to do the work. And for CGC, similarly, there was no intent to do the work. And that was precisely what the trial court found. I don't understand the concealing nature of that. With your IALTA stuff, with Rams and Isaac, I understand what your argument is there, that they wanted to get, your argument is they wanted to get a kickback to Carla Oglesby, and they tried to make it look like a business-to-business transaction when really it was just a payoff. And so they did it by funneling money through companies. But when CGC is one of the vendors, whether they should have been or not, that's your theft argument. They get this money, and then whatever they do with it, they deposit in their own accounts, they transfer it on their accounts, they give it to Array. What is that concealing? How is that concealing the criminal derivation of the money? Well, part of what was charged was that the checks, wire transfers, or withdrawals were transferred to further conceal or disguise the nature, location, source, or ownership or control of the criminally-derived property. What is the criminally-derived property? The money. What do you mean in your brief when you say the basis of the money laundering charge was the defendant's theft of over 100,000 of county money using illegitimate vendor contracts? What do you mean by that? Well, the basis of the money laundering charge, there has to be an initial criminal act. That's part of what defendant first contested in her second issue, where she said the indictment did not sufficiently specify the financial transaction that was being used as the basis for the money laundering. So the financial transaction here was the theft. You had to have this first criminally-derived property that then would be laundered to conceal and disguise its source, ownership, control, et cetera. So what was that done? By actually issuing checks to companies that really weren't in existence or doing anything or were created for the sole purpose of accepting the derived funds? Yes, in large part. There were 15 contracts, as counsel stated earlier. Two of them returned the money. So 13 contracts where the individuals who received that money kept it. That amounted to approximately $325,000. So the checks that were issued to these companies, for example, that Biology and whatever, was really disguised as a legitimate transfer of money? Correct. For work that was never, ever intended to be done? Yes. Where did that actual laundering begin? It began, I would say, with defendants, because while counsel argues that Eugene Mullins is somehow responsible for initiating or conducting these, Eugene Mullins was certainly involved. That's something that's rampant throughout the record, and we certainly agree with that. I think that was proven time and again. But as for the contracts themselves, of the 15 and of the 13 that kept the money, there were 11 contracts signed by the defendant. One of those kept the money. So 10 contracts that signed by the defendant where they kept the money. Those could not have been created were it not for the defendant's signature. Eugene Mullins didn't have the signatory authority to sign for them. The defendant obtained signatory authority by working with Faisal Abbasi, who obtained her new signature card, who wrote in this authority. And, in fact, it granted her larger and broader signatory authority than her own supervisor. Were there cash payments put into this RA account? Cash payments into the RA account? RA. From what I remember, I would have to look at the bank accounts again, but I remember cash payments specifically to CGC. There may have been cash deposits to RA as well. I couldn't tell you exactly. What about your unlawful stringing charge? You say that the stringing was to evade the requirements for the Cook County Board approval. That's not really avoiding the bidding, is it? I would say it's for both. So the way the contracts were created, there's two parts. Under 25 evades board review. Sole source evades bidding. Neither one does both. You have to have both together. So if a contract is sole source, it can be – Don't you have to tell the defendant that you have to charge what you're suggesting? You couldn't have solely just avoiding board review to establish this charge. Correct. No, you don't put in here that these were set up for the purpose of evading bidding, do you? You say they were – the purpose was to, in effect, divide the contracts and $100,000 each into eight contracts, each worth over $24,900, but under $25,000, and for the purpose of doing so was to evade the requirements of the board approval. Well, requirements of board approval, there would be – one would be board review, but the requirements of these contracts, they required at the very highest of bidding. The only way you can avoid bidding is to make sure that they're sole sourced. Isn't that correct? That's correct. And that's not anywhere in here, is it? The word sole source is not, no. So didn't Ms. Ogilvie defend against this charge the way it was worded? There's nothing in there about sole sourcing. There's nothing about how she specifically avoided the bidding requirements by issuing justification letters that resulted in this no bidding because they were all sole sourced. There's nothing in the charge that says that, is there? No, and I would note that the defendant doesn't challenge the indictment or the charge on this charge at all, either at trial or on appeal. So I don't think she's contending that she wasn't able to defend against the stringing of bids as it was charged. But as to that charge specifically – Well, I think she did argue here today that simply having it evade the board review is not establishing the bid-ringing charge at all. And that's her position. That's how she tried it. That's what she believed was the charge, and she's arguing that that in itself is not evading the bidding requirements. Simply having a contract be under $25,000 made certain that the board wouldn't review it, but it has nothing to do with evading the bidding, does it? It doesn't, but that wasn't how the contracts were formed. They were formed as sole source contracts. And, in fact, that specific portion of it, the fact that they were formed as sole source is where defendant's action is most apparent because it's true there's no direct evidence as to who made the ultimate decision to split these contracts up into eight that were under $25,000. But there is direct evidence as to who signed the justification letters, who created these contracts with a justification letter that said, we need these to be sole source. This is what these companies are capable of doing. This is what they're experienced in doing. This is what the company that can do this specific contract. And that was the defendant. So she's the only person who we have evidence of who justified these to be sole source, which is how they had to be done. You had to have a justification letter. Hers is the only signature on them. Counsel, there is evidence that the defendant played a role in the sole sourcing, but when you indicted her, you said that she violated the bid stringing statute by virtue of how they valued the dollar amounts, just under $25,000 to avoid board approval, which I think we already can agree that is not a violation. That is not done to avoid competitive bidding. In her motion for a directed verdict at trial, she argued trying to avoid board approval is not competitive bidding. Motion for a directed verdict was denied. In closing argument, she argued just putting numbers under $25,000 to avoid board approval is not a violation of the competitive bidding law. Got a guilty verdict anyways. Now she's arguing the same thing on appeal. What are we supposed to do in a situation where you did not accuse her, in the indictment at least, you did not specify in the indictment the act that would have constituted the crime, and in fact, you did go to the trouble of specifying an act, but it's an act that does not constitute a crime. And she did argue, I agree with you, she did not move to dismiss the indictment. Okay? Should have probably, but didn't. That's fine. But now here we are. At the directed verdict stage, at trial, and on appeal, she keeps jumping up and down and saying that's not a violation of competitive bidding. What are we supposed to do with that? How is that fair to a defendant? Well, at this point, I would argue that the way that the case was tried, the defendant was able to sufficiently defend against the charges against her because this was thoroughly litigated. The sole source contract issue, the stringing of bids, was thoroughly litigated. And without any sort of motion to dismiss the indictment, without any sort of argument on appeal if the indictment was insufficient, then I would argue that issue has been waived. And as to the support of the charges, it was thoroughly litigated by both sides, I would say both at trial and on appeal. I will also move to the intent, because I know the defendant argued about the intent to prove theft. There was, as Justice McBride noted, there wasn't direct evidence of defendant's knowledge. It was circumstantial. There was quite a few things that circumstantially evince defendant's intent to commit theft here, to steal the over $325,000 from the county. As to the vendors, there were seven stipulated vendors. There was some discussion as to whether or not they claimed to do any work. Of the seven stipulated vendors, only four claimed to do anything. One of them claimed to only attend a couple of meetings, to send his wife to a couple of others. Three of them claimed to do actual work in the sense that one said he developed a communications plan and did door-to-door outreach. Another one said he did canvassing of Cicero for approximately 10 hours. And a third one said I believe he attended meetings as well, or distributed promotional materials on approximately 10 occasions. All four of those were signed, justification letters were signed by the defendant, and all four of those were actually the ones that provided cash kickbacks directly to Eugene Mullins. So there's a correlation there in the sense that the four companies, the four vendors who claimed to even do any work, were the ones who were directly involved with the criminal activities with Mr. Mullins as well. They were actually receiving the checks, taking cash out, and giving cash to Mr. Mullins in envelopes. Does it matter whether they actually did work? That's your choice A. Choice B, whether they intended to do work. Or choice C, whether the defendant intended that they would do work. Well, the defendant is charged with a theft here, not the vendors. Right. So the answer is? The answer would be C. What defendant intended. Correct. So what evidence do you have that the defendant intended? You've certainly made an argument that you presented evidence that she played a role in steering contracts to people. But what is the evidence that she knew or believed or intended that they wouldn't do the work once they got the contracts? Well, the evidence showed that she wrote these justification letters and she was the one making the representations to the county that the companies were both qualified and experienced. The evidence showed they were neither. Okay. They were not qualified because, as we've mentioned previously, some of them weren't even formed until after they received the money, and they weren't experienced for the same reasons. They didn't do this kind of work if they weren't formed before they received the check. Okay. Which proves that they were wrongfully steered. Correct. But what shows that she knew or intended that they were not going to do the work once they got it? Well, I mean, it could be steered work and do it, right? Correct. You can, but she was making false representations from the get-go, representations that they were experienced. Sure, to get them to the companies she wanted to get them to. Right. And I think that part of that showed her intent to obtain the money without any sort of work or honesty in these contracts whatsoever. I think it evinces directly her intent to get the money as quickly as possible into the hands of herself and the people she wanted it to go to and to hide that activity. Well, was there evidence in the record that basically the vast majority of them never did the work? There was evidence in the record that no work was ever found. So there's also some argument about whether or not the work was ever done because there was argument as to Investigator Patrick Blanchard's testimony. His testimony largely was that he didn't find any work. He, in fact, repeatedly testified, our investigation could remain open, we'd be open to receiving more work, but we looked for, from April of 2010 through September of 2010, quite strenuously, nothing showed up for work being done, not even paper documents. Well, does the fact that fact allow any other inference? The fact that the work was paid for before it was ever done. The fact that the work was never done. Does that allow for any further inferences? Yes, absolutely. Well, it allows for the inference that they never intended for the work to be done because specifically the defendant never intended for the work to be done because she made specific efforts to get the money issued to the companies before they ever did the work, which completely went against county policy. The employees from the county that testified about that said they'd never seen that happen before. They'd never seen the money get issued before the work.  And the invoice for CGC, for example, said that work was done from December of 2009 through March of 2010. The justification letter was signed on February 24th. The check was issued on February 26th. You don't have the sufficiency of the evidence issued, which really that's what it is for every county. Are we looking at the fact finder himself or are we actually looking at what any rational trier fact would do? It's whether any rational trier fact could have found the defendant guilty of that count. In real terms, what does that mean? Are we looking at his reasoning or are we looking at what any rational trier fact can do or could have done with facts presented in this case? We look at the latter, what any rational trier fact could have done, but any reasonable inferences have to also be determined in favor of the prosecution because that's part of the standard as well. So we look at whether any rational trier fact could have found that the evidence proved beyond a reasonable doubt that she was guilty of these crimes, that she had the intent, et cetera, and then inferences have to be resolved in favor of the prosecution. Well, this was clearly a circumstantial case, would you agree? No, absolutely. I think it was almost entirely circumstantial. Then there seems to be, though, this overlap, that there's something wrong with the charging documents, which is not the same as whether or not the evidence is sufficient. Do you know why a party can amend the pleadings to conform to the proof even on appeal? Do you understand that rule? Do you know that rule that a party can amend pleadings to conform to the proof before trial, at trial, and on appeal? I was not aware that we could. Okay. Well, it's out there. Actually, that's something that can be done. That's one of the reasons why there's different standards for when you challenge an indictment, whether you do it at pretrial, trial, after trial. And anyway, just a thought, but actually, yes, a party can amend their pleadings. Of course, you have to ask leave. The court has to make certain determinations. If there's prejudice to the party, the court certainly wouldn't allow it. But it is a general rule that you can amend pleadings to conform to the proof. You're saying that the proof in this case was always that these justification letters were sent out for the purpose of evading bidding. Correct? I would say both, yes. Correct. The $25,000 limit would certainly evade review. Right. But that in itself does not amount to stringing. Right. You agree with that, don't you? Of course. The justification letters were done because they had to make them sole source. Justification letters are not necessary for all contracts under $25,000. Right. So the justification letters that defendants signed were specifically going to make them sole source, which is the only way a contract evades bidding. And you're saying that's the way this case was tried, though. Correct. That the prosecution and the defense were completely on the same page in terms of this case was really about trying to evade, at least as far as that count goes, the unlawful stringing. As far as that count, yes, because sole source, again, was discussed at length, if not with every single county employee, then almost every single county employee. And certainly the justification letters and how they were used and the fact that sole source contracts are, how are they created and why they need justification letters, that was litigated at length, especially also with the fact that that was defendant's knowledge. That went through, there was Mr. Abbasi, I believe Justice Burke testified or asked about Mr. Abbasi. And Mr. Abbasi specifically was somebody that the defendant went to very, very early on in her tenure as the deputy chief of staff. It was within days of getting hired. And asked him not only about evading board review, but they talked specifically about sole source contracts and justification letters and how those could be expedited. So there was direct evidence from Mr. Abbasi that he worked with the defendant on how to get these contracts to be that combination of both $125,000 and sole source. If there are no further questions from your honors, for these reasons and those stated in our brief, we ask that you affirm defendant's convictions and sentences under counts four, seven, and 15. And vacate defendant's conviction under count three. Thank you, counsel. Thank you. Ms. Gichetti. Your honors, as to these suggestions that there were cash deposit kickbacks, there was absolutely no evidence that any deposit or check was a kickback. The only evidence as to kickbacks had to do with Eugene Mullins, and it was clear from that evidence that Carl Olesby was not involved in that and had no knowledge of that. That was absolutely stipulated testimony from the vendor. Didn't she sign off on those letters, though, with the ones that Mullins was the bag man for? She signed off on some letters, but again, those letters were not letters that she wrote. Those were vendors that did not know her. She did not select these vendors. Every one of the stipulations said. But isn't that part of the problem? I mean, she signs a letter saying, these people possess unique skill to do this contract that requires unique skill, and she didn't even know who these companies were. And she relied on Mr. Mullins, and that was the procedure that everyone testified was done with these letters. Counsel, that's your argument, but I mean, couldn't the prosecution argue that their position was that she wasn't just relying on Mullins, that she knew full well? They have to argue that from some evidence other than the procedure, and there is no other evidence of that. In other words, she's following this procedure everybody else follows in terms of signing these letters, and all of a sudden, for her, it is that they will not be doing the work. But the problem with this is, partially, that even though this was kind of the way it worked, that someone would sign off on the letter, the difference in this case was that all of these vendors were getting paid before they even did the work. So the inference that you can have on the one side is completely sort of washed away by the fact that this unusual procedure was going on at the same time. Getting paid for something it didn't do. And the payment in advance, while I'm not saying was a good thing, the other evidence in the case was that all of these contracts related to grants, federal grants, all of which had to be expended within a short period of time. David Ramos testified as to the census, that they had until, only until September, they had to expend the money and seek reimbursement within that time frame. And everyone testified, Mr. Gibbons testified, for example, that that was Carla Ogilvie's focus. So it is an unusual procedure, but it is not unusual in the context of having to spend the money to take advantage of the federal grant money, which would be gone unless the money was spent and reimbursed within that short time. Wasn't that the defense that was presented at trial? Yes. And isn't there a basis for the judge to accept or reject that defense? Of course, but it has to be on some other evidence. And what I'm saying is that that was the evidence that was presented. That was not a disputed issue, that that was the fact. It was never disputed that, in fact, these grants were going to be terminated within a short period of time. That wasn't a disputed factual issue. So based on that undisputed factual issue, all of the other evidence showing that it's going into her companies and that that was not appropriate for the trial judge to find her guilty of? No. And again, if you look at what he said, he didn't say, I find you guilty because you intended this work to never be done. He said, I find you guilty because this was not a good use of taxpayer money. But again, are we really looking at what his reasoning was, or are we looking at what a rational trial judge would have done had they been presented with the universe of evidence here? Does it really matter how he enunciates? I think it does, because I think that's what overlays all the evidence here, is that it is offensive politically. It's offensive as running a business. I think anyone who would look at it would be offended. That's why we have elections, to get people out of executive positions who spend money in a way we don't want. But offensive conduct is not a law. That's right. The issue for theft has to do with did she intend, no one intend that these vendors not perform these contracts, and that's where there's no evidence. And that is why I'm asking this court to reverse outright her convictions for theft, her conviction for money laundering based on that theft, and for all the reasons set forth in the brief, the stringing of bits count. Thank you. Thank you. Thank you, counsel. Thank you, counsels, for your argument today and for your briefs. A very interesting case, and we will take it under advisement.